IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TODD GLADYSIEWSKI, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 07-1339 |
| | ) | |
| ALLEGHENY ENERGY, | ) | Judge Cercone |
| Defendant. | ) | Magistrate Judge Hay |
| | ) | |

REPORT AND RECOMMENDATION

I.   Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendant (Docket No. 26) be granted.

II.   Report

Plaintiff, Todd Gladysiewski, brings this action against his former employer, Defendant

Allegheny Energy Service Corporation ("Allegheny"), contending that Allegheny's decision to

terminate him from his employment on May 15, 2007 constituted unlawful retaliatory

discrimination against him based on his filing of a previous lawsuit against Allegheny in 2005, in

violation of both the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (ADEA), and

the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA).  The first case, Gladysiewski

v. Allegheny Energy Service Corp., Civ. A. No. 05-992, 2007 WL 1112580 (W.D. Pa. Apr. 11,

2007) ("Gladysiewski I"), arose out of Plaintiff's demotion from the position of Serviceman A to

the position of Serviceman B on October 8, 2004, which he contended constituted unlawful age

and retaliation discrimination.  The case ended on April 11, 2007 when Judge Cercone adopted a

Report and Recommendation submitted by the undersigned and granted Defendant's motion for

summary judgment.  Plaintiff filed an appeal, but the Court of Appeals for the Third Circuit

dismissed the appeal as waived because Plaintiff had filed a patently inadequate appellate brief.

Gladysiewski v. Allegheny Energy Service Corp., 282 Fed. Appx. 979 (3d Cir. June 26, 2008).

Presently before this Court for disposition is a motion for summary judgment, submitted

on behalf of Defendant.  For the reasons that follow, the motion should be granted.

Facts

Allegheny delivers electric service, an essential public service which vitally affects the

health, safety, comfort and general well-being of large numbers of people.  (Gladysiewski I at

*1.)[1]  Because working with electricity and high voltage power equipment is potentially

hazardous, and accidents and mistakes can result in fatalities, it is essential to Allegheny that

Servicemen and Linemen continuously demonstrate that they know how to perform the work, are

ready, willing and able to perform it safely and effectively, and can effectively work with other

crew members and managers as a team.  (Gladysiewski I at *2.)

Plaintiff worked at the Lines, Installer and Service Center in Kittanning, Pennsylvania

("Kittanning Service Center"), where Allegheny employs utility linemen who install, remove,

maintain and repair power lines and related equipment.  (Gladysiewski I at *1.)   Allegheny hired

him in 1987 as a Laborer.  (Gladysiewski I at *2.)  Over the next several years, he progressed

through the serviceman ranks to a Serviceman A classification.  Plaintiff remained in this

position at the Kittanning Service Center and at this step from approximately 1994 until October

---

[1]For some of the historical facts in this case, Defendant cites this Court's Memorandum
Order adopting the Report and Recommendation in Gladysiewski I, which set forth undisputed
facts as supported in the record in that case, and Plaintiff has admitted these historical facts.

2004, when he was demoted and reclassified to the minimum wage progression for the Serviceman B classification.  (Gladysiewski I at *3.)

The decision to demote Plaintiff came only after months of observations and assessments by his managers.  The demotion was based on Allegheny's conclusion that his conduct was consistently deficient and that he, among other things, failed to follow instructions, failed to fully perform assigned work, and refused to participate in safety training.  Prior to the demotion, David Smith, Plaintiff's supervisor, and Jack Bowser, Smith's supervisor, discussed Plaintiff's inadequate performance with Todd Faulk, then Allegheny's General Manager of Personnel Relations.  (Gladysiewski I at *3.)

As a matter of company practice, Bowser and Smith did not have the sole authority to take employment actions against an employee, and such actions typically would be, as was the case for Plaintiff, the result of a discussion, consensus, and determination by and between Smith and Bowser, with Faulk's review and concurrence that any proposed course of action was in compliance with the Collective Bargaining Agreement ("CBA") and consistent with expectations and actions taken with other employees company-wide.  Bowser and Smith informed Faulk that Plaintiff was not, in their judgment, adequately demonstrating that he could effectively and, therefore, safely perform the duties of his Serviceman A classification.  In their judgment, Plaintiff demonstrated, among other deficiencies, a lack of teamwork and involvement in his work, failed to show he could adequately comprehend and follow directions, and demonstrated a poor attitude towards management, co-workers, and an apparent unwillingness or inability to perform Serviceman A duties.  (Gladysiewski I at *3.)

On October 8, 2004, Smith and Bowser met with Plaintiff and his Union representative to inform him of his demotion.  Plaintiff was given a letter which concluded as follows:

> As you know everyone in your classification is expected to progress to the A level.  Failure to demonstrate such progress in addition to correcting the behaviors and meeting the expectations identified above could result in further disciplinary action up to and including discharge.

(Gladysiewski I at *4.)  At the same meeting, Smith also provided Plaintiff with a Work Performance Summary that identified a history of problems, and a written Action Plan for Improving Work Performance ("Action Plan"), which set forth what Plaintiff needed to accomplish to progress back to the top of the Serviceman A classification.  (Gladysiewski I at *4.)

The Work Performance Summary highlighted, among other issues, Plaintiff's lack of call-out acceptance, his failure to follow company policy and procedures, his refusal to pay attention during work assignments and his unwillingness to participate in projects with co-workers.   The Work Performance Summary noted that Plaintiff had accepted only one of 139 call-out opportunities over the past 21-month period prior to his demotion.  (Smith Decl. Ex. 1 at AESC 00003-04.)[2]

The Kittanning Service Center where Plaintiff worked operates under a CBA between Allegheny and the Utility Workers of America Local 1021 ("Union").  (Gladysiewski I at *1.) Effective May 1, 2006 to May 1, 2011, Allegheny and the Union entered into a new CBA. (Faulk Decl. ¶ 5.)[3]

---

[2]Def.'s App. (Docket No. 29) Ex. C.

[3]Docket No. 29 Ex. B.

As part of the new CBA, all Linemen, Servicemen and utility workers were required to accept 10 call-outs and work 150 hours of overtime in each year of the CBA commencing with the 12-month period starting May 1, 2006.  (Faulk Decl. ¶ 5 & Ex. 1.)  Plaintiff (and every other Lineman and Serviceman a the Kittanning Service Center where he worked) was expected to accept 10 call-outs and work 150 hours of overtime during the period commencing May 1, 2006 and ending on April 30, 2007.  (Faulk Decl. ¶ 6.)  Plaintiff was aware of the CBA requirements regarding call-out acceptance and overtime.  (Gladysiewski Dep. at 61.)[4]

Events Post-Dating Plaintiff's Demotion

Despite having been repeatedly warned of the critical importance and contractual requirement to accept call-outs, Plaintiff accepted only one call-out from May 1, 2006 until May 1, 2007 (his last year of employment), falling far short of the call-out requirement established by the CBA.  (Faulk Decl. ¶ 6; Smith Decl. ¶¶ 15, 19.)  Also, during his last year of employment, Plaintiff failed to work the 150 hours of overtime required by the CBA.  (Faulk Decl. ¶ 6.)

Plaintiff notes that Linemen and Servicemen from other Service Centers who did not meet this requirement during the first year were given a three-month extension in order to meet it.  (Gladysiewski Dep. at 61; Heilman Dep. at 14-15[5].)  However, Todd Faulk notes that none of these individuals were subject to an Action Plan like Plaintiff and that he was the only Serviceman or Lineman on an Action Plan who did not meet the CBA requirements for call-outs and overtime.  (Faulk Decl. ¶ 7.)

_____

[4]Unless otherwise noted, all excerpts from Plaintiff's deposition are contained in Plaintiff's Appendix (Docket No. 33) Ex. 1.

[5]Pl.'s App. (Docket No. 33) Ex. 2.

Plaintiff also argues that a review of the call-out record shows that of the 36 calls that were made, only four actually reached him at the time of the call.  Of these four, he was excused for three and accepted the other.  Twenty-three others resulted in a message being placed on his answering machine, and no one spoke to him directly.  (Gladysiewski Dep. at 82-83 & Ex. 7.) Plaintiff explained that he is very involved with his family, and is often at sporting events or school activities with his children.  (Gladysiewski Dep. at 51-52.)  Although Allegheny had Plaintiff's phone numbers for both his home and cell, there is no indication that both were tried for any particular call-out attempt.  (Gladysiewski Dep. at 82-83 &. Ex. 7.)  He notes that there is nothing in the CBA to indicate that an employee must remain home in case an unexpected event would occur that would require a call-out.  (Gladysiewski Dep. Ex. 5.)

Allegheny notes in its reply that the call-out system is fully automated and that employees choose the primary number the system calls and can change it any time.  (Smith Supp. Decl. ¶ 3.)[6]  Thus, it contends that Plaintiff had control over whether he would receive the call-out call and could have changed the number to be his cell phone.  It also notes that the record indicates that nearly half of the calls to his home were made during the hours of 10:30 p.m. and 6:17 a.m., during which time his commitment to school and sporting events for this children should have been minimal or non-existent.  (Smith Decl. Ex. 1 at AESC 000070-71.)

Allegheny indicates that, on two occasions during his last year of employment, Plaintiff attempted to be paid for increased wages by entering time for Lead Lineman wages to which he was not entitled.  (Smith Decl. ¶¶ 17-19.)  It states that Plaintiff has admitted this misconduct. (Gladysiewski Dep. at 72.)  Plaintiff responds that, on the days in question, he performed the

---

[6]Def.'s Supp. App. (Docket No. 37) Tab 6.

work of a Lead Lineman, and so put in for Lead Lineman wages.  (Gladysiewski Dep. at 72-73.)
Plaintiff contends that he did not know and was never informed that doing so was improper or
against policy.  (Gladysiewski Dep. at 73.)

Smith states that, on two occasions, he personally observed Plaintiff not actively
participating in work assignments with his co-workers.  (Smith Decl. ¶¶ 12, 20.)  Plaintiff
responds that Smith's notes, from which these alleged observations are derived, are outright
lies.  (Gladysiewski Dep. at 42.)  Plaintiff states that, as a Serviceman, he had minimal
interactions with office personnel, such as Smith, as he was in the field.  (Gladysiewski Dep. at
34.)  Barry Heilman and Steve Cass, who directly supervised Plaintiff's work in the field, both
stated that he was a good worker during the relevant time period.  (Heilman Dep. at 9-13; Cass
Dep. at 12.[7])

Allegheny contends that Plaintiff continued to have problems getting along with his co-
workers.  For example, employees complained that Plaintiff, while on vacation, made a number
of calls to crew members on their cell phones, disrupting their daily working activity.  On another
occasion, co-workers complained that he was making them very uncomfortable by taking
pictures of them with his personal cell phone while they were working.  (Smith Decl. ¶¶ 13-14.)

Plaintiff specifically denies ever taking photos of co-workers with a camera phone or
calling Cass, the only individual identified by Allegheny as a recipient of a phone call from
Plaintiff despite its use of the plural, at work.  (Gladysiewski Dep. at 57, 74.)

On September 5, 2006, Smith conducted a review of Plaintiff's performance for the first
and second quarters of 2006.  Smith informed Plaintiff that his non-productive time was higher

---

[7]Docket No. 33 Ex. 4.

than expected and that he still had not accepted any call-outs.  Smith reinforced the importance of

accepting call-outs.  Smith states that, when he asked Plaintiff if he understood the review,

Plaintiff refused to speak or interact with him at all and he refused to sign the review.  (Smith

Decl. ¶ 15.)

Plaintiff states that he was consistently rated as highest or second highest in the weekly

productivity sheets issued by Smith at the Kittanning Service Center.  (Gladysiewski Dep. at 14.)

Allegheny responds that the productivity sheets cover a time frame from January 8 through April

22, 2006, prior to the last year of Plaintiff's employment and are therefore irrelevant to this

action.  (Gladysiewski Dep. at 74-75 & Ex. 15.)[8]

Plaintiff also indicates that his non-productive time was never discussed with him during

the last year of his employment. (Gladysiewski Dep. at 50.)  He denies that he ever refused to

interact with Smith, but instead stated that he did exactly what Smith told him to do.

(Gladysiewski Dep. at 50, 53.)

Smith states that, on October 11, 2006, while he was conducting oil spill training for the

Kittanning Service Center, he personally observed Plaintiff standing away from the group and

not paying attention.  (Smith Decl. ¶ 16.)  Plaintiff denies this statement and states that, due to

the dangers involved with the job, safety was very important. (Gladysiewski Dep. at 53.)

Because of this, he always cooperated fully when safety was involved.  He also notes that, on the

weekly performance sheets posted by Smith during the year, he was at the top of the list for both

productivity and safety.  (Gladysiewski Dep. at 41.)

---

[8]Docket No. 37 Tabs 4, 5.

Smith states that, on a safety compliance day, he personally observed Plaintiff standing back and not actively participating with other crew members at the pole top rescue station and tower rescue station.  Later in the day, another Allegheny supervisor conducting safety training expressed the same observation that Plaintiff stood back and did not actively participate.  (Smith Decl. ¶ 22.)  Plaintiff denies this allegation, citing his general safety concerns and being at the top of the list for both productivity and safety.  He further contends that events that allegedly occurred on May 3, 2007 are irrelevant to this action, as Smith and Bowser had already gathered and submitted the documentation supporting their recommendation for Plaintiff's termination by this time.  (Smith Dep. at 17-21 (stating that he had gathered the information in mid to late April, 2007).)[9]

In a performance appraisal dated April 12, 2007, Plaintiff received an overall score of 2.0 out of 5.0.  (Smith Decl. Ex. 1 at AESC 000055.)  Plaintiff states that the April 12, 2007 performance evaluation was not ever reviewed with him, nor was he counseled concerning any of the alleged deficiencies.  (Gladsiewski Dep. at 49, 81, 84.)  Allegheny admits that the evaluation was not reviewed with him, but points out that it covered many of the same shortcomings identified in the January 27, 2006 appraisal, which Plaintiff admits was reviewed with him. (Gladsiewski Dep. at 42; compare Smith Decl. Ex. 1 at AESC 000040-45 with AESC 000055-62.)

Plaintiff notes that in the April 12, 2007 performance appraisal, he was rated as exceeding the goal for effectiveness/efficiency and that it also noted that he did not have any OSHA recordable accidents, and PMV accidents, or any positive discipline.  (Gladsiewski Dep. at 49,

---

[9]Docket No. 33 Ex. 5.

53 & Ex. 4.)  However, he has not disputed the overall rating he received.  Allegheny provides

other details of the appraisal, including comments that he "will not interact when performing

quarterly safety reviews," that he "is not taking callouts as required in his performance plan," that

he "does not get involved with the other crew members during job planning," that he "does not

get deeply committed to work assignment," that he "does not interact with other employees well"

and that he was not progressing as hoped.  (Smith Decl. Ex. 1 at AESC 000056-60.)

<u>Smith and Bowser Confer</u>

In approximately April 2007, Smith and Bowser discussed the continuing problems with

Plaintiff's performance, behavior and attitude.  (Smith Decl. ¶ 5.)  In Smith's judgment, Plaintiff

continued to demonstrate, among other things, a lack of team work and involvement in his work,

a poor attitude toward management and co-workers and an apparent unwillingness to perform his

duties.  (Smith Decl. ¶ 6.)

Bowser and Smith determined that Plaintiff's conduct and behavior had remained

deficient during the approximately two and one-half year period since he had been demoted.   He

was simply not progressing despite corrective coaching and counseling.  (Smith Decl. ¶ 6.)

Plaintiff states that Smith did not discuss his performance with him or counsel him during

the last year of his employment.  (Gladysiewski Dep. at 41, 54, 55, 58-59, 80-81, 84-85.)  He

does admit that he had progressed only one step since his demotion in October 2004.  (Faulk

Decl. ¶ 9.)

Bowser and Smith believed that termination of Plaintiff's employment was the proper

course.  (Smith Decl. ¶ 6.)  They informed Todd Faulk, then Allegheny's General Manager of

Personnel Relations, that Plaintiff was not, in their judgment, adequately performing to the next

classification level within the Lineman B designation and that they believed termination of his employment was the proper course.  (Faulk Decl. ¶ 9; Smith Decl. ¶ 7.)[10]

At the time of Faulk's involvement, Allegheny knew that Plaintiff was close to having failed to satisfy the contractual obligations to accept 10 call-outs and work 150 hours of overtime.  After April 30, 2007, Allegheny knew that he had failed to meet these contractual obligations.  (Faulk Decl. ¶ 9.)  Although the CBA contractually obligated Plaintiff to accept a minimum of 10 call-outs from May 1, 2006 to April 30, 2007, he had accepted only one call-out despite 33 opportunities.  He also failed to fulfil the CBA's required 150 hours of overtime during the same 12-month period.  (Faulk Decl. ¶ 6.)

Independent Review

Accordingly, Faulk agreed that Allegheny should terminate Plaintiff's employment. (Faulk Decl. ¶ 9.)  To avoid even an appearance that Allegheny's decision was based on retaliatory animus, Allegheny performed a second, independent review of the termination decision.  (Faulk Decl. ¶ 10.)  Allegheny elected to have two managers with no knowledge of Plaintiff's claims review the relevant information concerning his performance and determine whether the information supported a decision to terminate his employment.  The individuals chosen for this review were Robert Henry, then Executive Director, Distribution; and Debra West, then Director, Organizational Effectiveness & Corporate Services Business HR Support. (Faulk Decl. ¶ 10.)

_____

[10]As noted in Gladysiewski I, as a matter of company practice, Bowser and Smith did not have the sole authority to take an employment action against an employee and such actions typically would be the result of discussion, consensus and determination by and between Bowser and Smith with Faulk's review and concurrence for the purposes of determining that any proposed action would be in compliance with the CBA.  (Faulk Decl. ¶ 8.)

Neither Henry nor West had any knowledge that Plaintiff was involved in a lawsuit against Allegheny or had ever filed any charges with the Equal Employment Opportunity Commission or the Pennsylvania Human Relations Commission.  West had never even met Plaintiff and he did not know Henry or West.  (Faulk Decl. ¶ 10; Henry Decl. ¶ 6; West Decl. ¶ 6; Gladysiewski Dep. at 35[11].)

Henry and West were provided with information regarding Plaintiff's performance, which included: the October 8, 2004 letter from Smith advising Plaintiff of his demotion from Serviceman A to Serviceman B, minimum; the work performance summary that Smith prepared identifying problems with his performance from December 1999 through October 1, 2004; documentation of the meeting Smith and Bowser held with Plaintiff to inform him of his demotion; the action plan for improving work performance dated October 8, 2004; approximately 31 pages of documents concerning his performance issues and attitude from 1997 through October 2004; a performance evaluation dated January 27, 2006, providing his overall score of 2.3 out of 5.0, which includes notations regarding a mid-year review on September 5, 2006 in which Smith noted that Plaintiff's non-productive time exceeded the minimum threshold and therefore was deficient and identifying that his call-out acceptance remained at zero percent; additional documentation concerning continued performance and attitude problems with him after the implementation of the action plan in October 2004 up through May, 2007; a performance appraisal dated April 12, 2007, giving Plaintiff an overall score of 2.0 out of 5.0; documentation concerning his call-out acceptance from May 1, 2006 to May 1, 2007 showing that he accepted only one of 33 call-outs; and documentation showing that he worked less than

---

[11]Docket No. 29 Ex. A.

150 hours of overtime from May 1, 2006 to May 1, 2007.  (Faulk Decl. ¶ 11; Smith Decl. ¶ 9 &

Ex. 1; Henry Decl. ¶ 4; West Decl. ¶ 4.)

After their review of the information, both Henry and West agreed that termination of

Plaintiff's employment was appropriate.  (Faulk Decl. ¶ 11; Henry Decl. ¶ 5; West Decl. ¶ 5.)

They indicated that, among other factors, Plaintiff had not progressed back to the Serviceman A

level within a two-year time frame of his demotion to Serviceman B even though he was given

training and coaching.  In addition, despite being told numerous times via coaching, reviews and

performance evaluations what needed to be done to correct his performance (i.e., accepting call-

outs, working more overtime, teamwork, involvement in assignments, following instructions,

improving attitude, etc.), Plaintiff failed and refused to take any such steps.  (Henry Decl. ¶ 5;

West Decl. ¶ 5.)

Plaintiff admits that he had not progressed back to Serviceman A within two years of his

demotion, but he denies that he was given coaching or training.  To the contrary, Plaintiff stated

that Smith did not discuss his performance with him or counsel him during the last year of his

employment.  (Gladysiewski Dep. at 41, 54, 55, 58-59, 80-81, 84-85.)  He also denies that he had

any deficiencies in the areas of teamwork, involvement in assignments, following instructions or

attitude.  To the contrary, the Lead Linemen, the individuals who actually supervised Plaintiff

when he performed the duties of his job, stated that he was a good worker.  (Heilman Dep. at 7,

9-13; Cass Dep. at 12.)  In fact, Heilman, who supervised Plaintiff on a daily basis prior to

Heilman's transfer to Arnold in April 2006 and frequently after his return to Kittanning in

October 2006, stated that he never had to talk to Plaintiff about performance problems; that he

followed instructions well; that he didn't have any shortcomings when it came to working as part

of a team; and that his attitude was fine.  (Gladysiewski Dep. at 40 (during last year of employment, Heilman and Cass were the Lead Linemen to whom he was regularly assigned); Heilman Dep. at 7-8, 12.)  Heilman also stated that Smith and Bowser never questioned him concerning Plaintiff's performance after Plaintiff's demotion, although they did ask questions concerning other employees.  (Heilman Dep. at 11-12.)  Finally, Heilman testified that no crew members have ever complained to him concerning any aspect of Plaintiff's performance.  (Heilman Dep. at 12.)  Similarly, Cass testified that none of the Lead Linemen who may have had Plaintiff on their crew during Plaintiff's last year of employment ever complained to him concerning Plaintiff's performance.  (Cass Dep. at 14-15.)

Plaintiff also notes that, during his deposition, Faulk failed to mention the review conducted by Henry and West, but instead implied that he and Bob Kemerer, with input from Smith and Bowser, had made the ultimate decision to terminate Plaintiff's employment.  (Faulk Dep. at 10, 12-16.)[12]  Furthermore, Plaintiff notes that there was never a meeting held with him or his Lead Linemen concerning the termination prior to the termination meeting itself.  (Gladysiewski Dep. at 63-64; Cass Dep. at 7, 12; Heilman Dep. at 11 (was not asked about Plaintiff's performance at any time after Plaintiff's demotion, although such information was requested for other employees on his crew)).  Accordingly, Plaintiff contends that any decision rendered by such a review board would, by necessity, have been based on information provided by Smith and Bowser to support his termination. (Faulk Dep. at 10 (Smith and Bowser forwarded him the information supporting the recommendation of termination); Smith Dep. at 17-20 (detailing information he and Bowser supplied to Faulk)).

---

[12]Docket No. 33 Ex. 6.

According to Faulk, had Henry and West determined that termination of Plaintiff's employment was not appropriate, Allegheny would not have terminated his employment in May 2007.  (Faulk Decl. ¶ 12.)  On May 15, 2007, Allegheny terminated Plaintiff's employment. (Gladysiewski Dep. at 9-10.)[13]

Procedural History

Plaintiff filed this action on October 3, 2007 and on October 22, 2008, he filed an Amended Complaint (w/Docket No. 20).  Count I alleges that his termination was an act of discrimination against him on the basis of his prior protected activity, and thus constituted retaliation in violation of the ADEA, and Count II repeats this allegation under the PHRA.

On May 1, 2009, Defendant filed a motion for summary judgment.

Standards of Review

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party,  "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as

---

[13]Docket No. 29 Ex. A.

a matter of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.  Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

In the absence of direct evidence of discrimination,[14] a plaintiff may establish a prima

facie case of discrimination indirectly following the shifting burden analysis set forth by the

Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas

Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  Chipollini v.

Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987) (en banc).  This model also applies to

actions brought pursuant to the PHRA.  See Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972

(3d Cir. 1998).

If the employee presents a prima facie case of discrimination, the employer must

"articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."

McDonnell Douglas, 411 U.S. at 802.  If the employer specifies a reason for its action, the

employee must have an opportunity to prove the employer's reason for the adverse employment

action was a pretext for unlawful discrimination.  Id. at 804.  The Court of Appeals has stated

that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's
> proffered  legitimate  reasons must allow a factfinder to reasonably infer that each
> of the employer's proffered non-discriminatory reasons was either a post hoc
> fabrication or otherwise did not actually motivate the employment action  (that is,
> the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

---

[14]Plaintiff admits that he has no direct evidence of any retaliation.  (Gladysiewski Dep. at
37-38.) (Docket No. 29 Ex. A.)

<u>Retaliatory Discrimination</u>

Discrimination against an individual who has opposed a practice prohibited by the ADEA or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under the statute is itself actionable conduct.  29 U.S.C. § 623(d).  The same is true under the PHRA.  43 P.S. § 955(d).

The Court of Appeals has held that the prima facie case elements for a claim of retaliatory discrimination are as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action.  <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 341-42 (3d Cir. 2006).

<u>Plaintiff's Prima Facie Case</u>

Allegheny assumes for the purposes of its motion that Plaintiff engaged in protected activity and suffered an adverse employment action.  (Def.'s Br. at 12 n.5.)[15]  In addition, it is noted that filing a claim of discrimination constitutes protected activity and that being fired constitutes the quintessential adverse employment action.  <u>See</u> <u>Abramson v. William Paterson College of N.J.</u>, 260 F.3d 265, 287-88 (3d Cir. 2001) (acceptable forms of protected activity include formal charges and informal protests).

However, Allegheny disputes that Plaintiff can establish a causal connection between his filing of <u>Gladysiewski I</u> on July 21, 2005 and the termination of his employment nearly two years

---

[15]Docket No. 27.

later on May 15, 2007.  Plaintiff contends that the decision to terminate his employment was made in retaliation for his filing of Gladysiewski I.  (Gladysiewski Dep. at 85.)

The Court of Appeals has explained that a plaintiff can substantiate a causal connection between the protected activity and an adverse employment action by: 1) showing that the temporal proximity is "unduly suggestive"; 2) showing "inconsistencies in the defendant's testimony"; or 3) pointing to ongoing antagonism.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).  The court has noted that, "[w]ith one exception, we have never held that timing alone can be sufficient to establish causation."  Weston v. Commonwealth of Pa., 251 F.3d 420, 431 n.5 (3d Cir. 2001) (citing a case in which an employee's dismissal two days after the company learned of his EEOC complaint was sufficiently persuasive to satisfy the causation element).  In Weston, the court held that alleged incidents more than one year apart, without other evidence, were insufficient to establish a causal link.  Id. at 431-32.

Plaintiff argues that he can establish temporal proximity between the time the Court entered summary judgment in Defendant's favor in Gladysiewski I (April 11, 2007) and the time Smith initiated the process that resulted in his termination, in mid-April 2007.  He cites Annett v University of Kansas, 371 F.3d 1233 (10th Cir. 2004), in support of this argument.  In that case, a professor who was denied tenure and terminated brought suit against the university.  While the case was pending, she applied for another position within the university but her application was denied.  She filed suit a second time, contending that the university's failure to hire her was in retaliation for her act of having brought the first suit.  The Tenth Circuit held that "[t]emporal proximity between Annett's previous lawsuit, resulting in a verdict rendered in March 2000 with post-trial motions continuing into June 2000, and the University's decision not to interview and

hire Annett in May 2000 and June 2000 respectively, suffice to demonstrate causation for the purpose of establishing a prima facie case." Id. at 1240.[16]

Allegheny responds that Annett is distinguishable because in that case, the refusal to hire decision was made only after the plaintiff's prior lawsuit was decided. Here, by contrast, Allegheny had informed Plaintiff as far back as October 2004 (approximately 2½ years prior to the dismissal of Gladysiewski I) that he was subject to an Action Plan and that failure to meet the expectations of that plan could result in his discharge.

It is not clear why the Court of Appeals for the Tenth Circuit allowed the plaintiff to establish temporal proximity by measuring from the date of the jury verdict to the date she was rejected for a new position. The court did not explain why it did not use the date she filed her suit claiming discrimination (February 1999), which constituted her protected activity, as the starting point. Thus, although Annett supports Plaintiff's position, the court provides no reasoning to allow this Court to determine whether the decision is persuasive.

Plaintiff has cited no authority from the Court of Appeals from the Third Circuit to support his position and the Annett case provides no reasoning to support its conclusion. It is unlikely that the Court of Appeals for the Third Circuit would find Annett persuasive and conclude that Plaintiff can measure from the date Gladysiewski I was decided to the date the process resulting in his termination began and point to an unduly suggestive instance of temporal proximity.

---

[16]Ultimately, however, the court affirmed the district court's granting of summary judgment to the university on the ground that Annett failed to meet her burden of demonstrating pretext. Id. at 1240-42.

Plaintiff also attempts to point to ongoing antagonism.  He contends that, during the last year of his employment, he was selected for drug and alcohol testing each time a random drug screening was conducted at the Kittanning Service Center.  This occurred even though he had never tested positive for drugs or alcohol.  (Gladysiewski Dep. at 28-29.)

Allegheny responds that there were three random drug tests at the Kittanning Service Center during the last year of Plaintiff's employment and he was randomly selected only once.  (Reid Decl. ¶ 6.)[17]  In addition, the random drug test is required by the United States Department of Transportation and is conducted by an independent third-party vendor that randomly selects the participants in the testing and Plaintiff was part of the employee pool covered by the Federal Motor Carrier Regulations.  (Reid Decl. ¶¶ 3-5.)

Plaintiff notes that the Court dismissed Gladysiewski I on April 11, 2007, and contends that, soon thereafter, he was subjected to heightened scrutiny, i.e. fault would be found with his work and not the identical work of a co-worker.  (Gladysiewski Dep. at 19; see also Gladysiewski I at 47 (noting that Michael Wright testified that, during crew visits following the time Plaintiff filed his charge, Plaintiff was made to redo work unnecessarily while the identical work of co-workers went unchallenged.)).

Allegheny responds that this is misleading, as Plaintiff himself testified that the incident in which he claims his work was scrutinized more closely occurred in 2004.  (Gladysiewski Dep. at 19.)  Thus, Allegheny contends that these allegations were the focus of Gladysiewski I where the Court entered summary judgment in favor of Allegheny and that this case focuses on the last year of Plaintiff's employment, namely from May 1, 2006 to May 15, 2007.  Plaintiff has cited

---

[17]Docket No. 37 Tab 1.

no evidence that his work was subjected to heightened scrutiny during the last year of his employment.

Allegheny has raised considerable doubt as to whether Plaintiff can rely on temporal proximity or ongoing antagonism. Nevertheless, out of an abundance of caution, the Court may assume that Plaintiff could establish a prima facie case of retaliatory discrimination.

Defendant's Proffered Reason

The burden of production therefore shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. It cites the reasons identified above: he was not performing up to standards, behaved poorly and had a bad attitude, all of which, it contends, dated back to before his demotion in October 2004. He did not take sufficient call-outs or work sufficient hours of overtime. The problems identified in the Work Performance Summary persisted and his failure to improve ultimately led to his termination.

The Supreme Court has held that "[e]mployers need not suspend previously planned transfer upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001). Similarly, Allegheny contends, its Action Plan, which was implemented in October 2004, did not have to be suspended because Plaintiff filed a complaint of discrimination and his termination was ultimately the result of his failure to meet the requirements of that plan. Nor was Plaintiff excused from the CBA requirements of performing 150 hours of overtime and accepting 10 call-outs merely because he had filed claims of discrimination.

Finally, Allegheny contends that Plaintiff cannot dispute that it asked two independent managers, who had no knowledge of his protected activity, to review documentation concerning his work performance and determine whether the information supported a decision to terminate his employment.  These managers, West and Henry, agreed with Smith, Bowser and Faulk that the record supported Plaintiff's termination.[18]

Defendant has met its burden of production.  Therefore, Plaintiff is required to point to evidence from which the trier of fact could conclude that Defendant's proffered reasons are a pretext for unlawful retaliation discrimination.

Plaintiff's Evidence of Pretext

Plaintiff proceeds along "Fuentes prong one" by arguing that he has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason. Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).

Plaintiff presents the following arguments: 1) he disputes that some of the incidents cited by Smith and relied on by Allegheny actually occurred; 2) he admits certain other incidents but contends that he was treated in a discriminatory manner as compared to other employees; 3) he disputes Allegheny's assessment of his performance, notes that he was not provided with the April 12, 2007 review and contends that the Henry/West independent review was based on the biased information provided to them by Smith and Bowser; and 4) he proffers evidence that Lead

_____

[18]Defendant cites cases for the proposition that an employee cannot establish a prima facie case of discrimination when the individual responsible for the adverse employment action was not aware of the employee's protected activity or status.  (Docket No. 27 at 14-15.) However, it does not contend that Henry and West made the actual decision to terminate Plaintiff's employment, only that they concurred in the decision reached by Smith, Bowser and Faulk.  Thus, the cases Defendant cites are inapposite.

Linemen who knew his work in the field were not consulted prior to the termination, thought he was doing a good job and did not agree with the decision to terminate him.

The first three arguments may be dealt with summarily.  As in <u>Gladysiewski I</u>, Plaintiff is attempting to create a genuine issue of fact by proffering his own opinion about his performance and disputing whether certain incidents occurred or the significance of them.  However, he cannot do so: the Court of Appeals has emphasized that "we do not sit as a super-personnel department that reexamines an entity's business decisions."  <u>Brewer v. Quaker State Oil Ref. Co.</u>, 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted).  Or, as stated somewhat differently, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  <u>Fuentes</u>, 32 F.3d at 765.

Second, to the extent that Plaintiff implies Allegheny focused on the wrong criteria in assessing his performance (because, for example, he was consistently rated as highest or second highest in the weekly productivity sheets issued by Smith at the Kittanning Service Center), the Court of Appeals has stated that "the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action.  The employee's positive performance in another category is not relevant, and neither is the employee's judgment as to the importance of the stated criterion."  <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 647 (3d Cir. 1998) (citations omitted).  As the Court of Appeals has also noted, "it is axiomatic that the mere fact that a different, perhaps better, method of evaluation could have been used is not evidence of pretext unless the method that was used is so deficient as to transgress the <u>Fuentes</u> standard." <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 471 (3d Cir. 2005) (citations omitted).

Plaintiff contends that, although he did not meet the CBA requirements of taking ten call-outs and working 150 hours of overtime, Linemen and Servicemen from other Service Centers who did not meet this requirement during the first year were given a three-month extension in order to meet it.  (Gladysiewski Dep. at 61; Heilman Dep. at 14-15.)  Thus, he appears to be arguing that he was subjected to unduly harsh treatment as compared to others.

However, Allegheny responds that none of these individuals were subject to an Action Plan like Plaintiff and that he was the only Serviceman or Lineman on an Action Plan who did not meet the CBA requirements for call-outs and overtime.  (Faulk Decl. ¶ 7.)

At the pretext stage of the analysis, Plaintiff must delve more deeply into whether he and other employees are "similarly situated."  Simpson, 142 F.3d at 646.  He has not responded to Allegheny's point that he was the only Lineman or Serviceman subject to an Action Plan who did not meet the requirements of the CBA, and thus he was already subject to a requirement that he improve his performance (including taking more call-outs) pursuant to the Action Plan.  He had already been demoted and was expected to do better.  Thus, he has not demonstrated that he was similarly situated to other Allegheny employees who were not in his circumstances and who were given an additional three months to meet the CBA requirements.

Plaintiff contends that the information Henry and West received from Smith and Bowser was biased and thus it does not demonstrate that Allegheny performed an "independent" review.  Allegheny responds that Plaintiff proffers no evidence in support of this claim.  On the contrary, the record indicates that the information contained positive comments about him, such as his meeting his goal for effectiveness and meeting standards for attendance and punctuality.  (Smith

24

Decl. Ex. 1 at AESC 000041-44, 53, 59-60.)  Allegheny states that, on the whole, the negative aspects of Plaintiff's performance far outweighed the positive ones.

Finally, with respect to Plaintiff's observation that he was not provided with the April 12, 2007 review, the Court of Appeals has noted that:

> from a legal perspective managers are not compelled to convey their dissatisfaction to employees. See Pierce v. New Process Co., 580 F. Supp. 1543, 1545 (W.D. Pa.), ("[T]he company is under no obligation to warn plaintiff of complaints regarding his performance and, if anything, the effect of such evidence is equivocal, perhaps indicating that plaintiff was receiving the benefit of the doubt."), aff'd mem., 749 F.2d 27 (3d Cir. 1984).

Healy v. New York Life Ins. Co., 860 F.2d 1209, 1216 (3d Cir. 1988).

Thus, the only evidence upon which Plaintiff can rely are the Lead Linemen's comments that they were not consulted about Plaintiff's termination, that they believed he was doing a good job and that they disagreed with Allegheny's decision.  Unfortunately, these comments provide far less support than Plaintiff contends.

First, Allegheny notes that, although Heilman and Cass worked as Plaintiff's Lead Lineman at times during his last year of employment, they did not do so as much as he implies. Heilman transferred to the Arnold Service Center in April 2006 and returned to Kittanning in October 2006 and he could not recall if he returned to being Plaintiff's Lead Lineman when he returned to Kittanning.  (Heilman Dep. at 8-10.)  Thus, at best, he was not present during approximately six months of Plaintiff's last year of employment.  Cass testified that he was acting Lead Lineman during the time Heilman was in Arnold, but indicated that he did not act as Plaintiff's Lead Lineman every day.  Cass did state that none of the three other individuals who acted as Plaintiff's Lead Lineman during that time ever came to him to complain about Plaintiff's performance.  (Cass Dep. at 14-15.)

Second, and more importantly, Allegheny is not relying on incidents that the Lead Linemen would have been aware of.  Rather, the incidents were observed directly by Smith or reported to him by employees who were not Lead Linemen: he saw Plaintiff failing to participate in various training exercises, he was informed that Plaintiff was taking pictures on his cell phone and disrupting co-workers by calling them while they were working, he discovered that Plaintiff was requesting Lead Lineman wages to which he was not entitled, and he compiled the performance reviews that indicated Plaintiff was not improving his performance and attitude since his demotion.  (Smith Decl. ¶¶ 5-7, 12-20, 22.)  In addition, it is undisputed that Plaintiff failed to take sufficient call-outs and work sufficient overtime.  Thus, the Lead Linemen's positive comments do not contradict the incidents observed and documented by Smith and/or admitted by Plaintiff and do not demonstrate pretext.

Plaintiff has failed to point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." Fuentes, 32 F.3d at 765.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 26) be granted.

Within fourteen (14) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall

have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/ *Amy Reynolds Hay*
Chief United States Magistrate Judge

Dated: 26 October, 2009

cc:      All counsel of record by Notice of Electronic Filing